1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DANIEL MAURICE ROCHA,**<br><br>Petitioner,<br><br>v.<br><br>**M. McDONALD, Warden,**<br><br>Respondent. | **Case No. 1:11-cv-00311 LJO MJS (HC)**<br><br>**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent is represented by Catherine T. Nieto of the office of the California Attorney General.

**I.      PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Calaveras, following his conviction by jury trial on August 29, 2007, of first degree murder, possession of a firearm by a felon, and offering to bribe a public employee. (Clerk's Tr. at 641-44.)  On December 12, 2007, Petitioner was sentenced to an indeterminate term of seventy-five (75) years to life. (Clerk's Tr. at 641-44.)

Petitioner filed a direct appeal with the California Court of Appeal, Third Appellate

District, on December 17, 2008. (Lodged Doc. 4.) The appeal was denied on September 1, 2009. (Answer, ECF No. 17, Ex. A.) Petitioner's petition for review, filed with the California Supreme Court, was summarily denied on November 10, 2009. (Lodged Doc. 6.)

Petitioner filed his federal habeas petition on January 5, 2011. (Pet., ECF No. 1.) The petition raised four grounds for relief: 1) The trial court's derivative liability instructions were deficient; 2) the trial court's murder instructions regarding aiding and abetting liability were incomplete; 3) the trial court improperly admitted expert testimony regarding intent and knowledge, or, alternatively Petitioner's counsel was ineffective for failing to object; and 4) the gang expert's use of hearsay evidence violated Petitioner's rights under the Confrontation Clause.

Respondent filed an answer to the petition on November 23, 2011. (Answer, ECF No. 17.) Petitioner filed a traverse on January 18, 2012. (Traverse, ECF No. 21.)

## II.    STATEMENT OF THE FACTS[1]

One night defendant Daniel Rocha and Donald Pinon broke into James McLain's room and then shot and killed his housemate David Jessop. …

### FACTS

### David Jessop Is Found Dead

David Jessop lived in a house in Mokelumne Hill with his older brother Matt Jessop, Matt's girlfriend Elizabeth Barnes, and James McLain. McLain sold marijuana out of his bedroom and kept his door locked. McLain was friendly with Donald Pinon, but had never sold him marijuana. Matt Jessop also knew Pinon.

Rhonda Haaland lived next door with her children Chelsea and Dallas. In March of 2005, Chelsea was in San Francisco at school. Pinon was Chelsea's boyfriend and had visited her at her mother's home.

On March 15, 2005, McLain spent the night at his girlfriend's home. Matt Jessop went to work that night at Denny's. About 11:00 p.m., Barnes went to visit Matt at work. When she returned home at 4:00 or 5:00 in the morning, the lights in the house were on. She went upstairs and found that

---

[1] The Fifth District Court of Appeal's summary of the facts in its September 1, 2009 opinion is presumed correct.  28 U.S.C. § 2254(e)(1).

her bedroom door was open and that McLain's door had been forced open. She went to Jessop's bedroom and found Jessop in his bed under a sheet. Barnes lifted the sheet and saw blood coming out of his ears. She ran downstairs and called 911.

David Jessop had died immediately from a gunshot wound to the back of his head. The bullet exited his forehead. The police found the bullet in his pillow. When they moved the body, they found a .40-caliber gold Smith and Wesson shell casing.

The door to McLain's room, which had been closed with a deadbolt lock, was damaged; the door frame was cracked. The television was pulled out from the wall and the closet doors were off the runners. The police found $ 1,360 in a tennis shoe in McLain's room. They found a rifle in Matt Jessop's room and several other guns.

**Events at Vince Schroven's House That Night**

That same night Margarida Allen and Kassandra Domingo went to Vince Schroven's house in Mokelumne Hill. In addition to Schroven, Anthony Patrick and Daniel Tyndall were there. Defendant and Pinon arrived later. They were both drinking Bacardi rum and were drunk.

Defendant had a black gun and bullets. Several people handled it. A bullet was ejected from the gun; it was collected and later Tyndall gave it to the police.**[FN2]** The bullet was a .40-caliber Smith and Wesson. It could not be conclusively determined if that bullet was from the gun that fired the bullet that killed David Jessop. Schroven wanted to buy the gun, but defendant said no because if Schroven was caught with the gun he would be in trouble for two murders.

**FN2**. Tyndall passed away before trial.

Defendant was angry with Pinon that night and yelled at him. He pointed the gun at Pinon, said he was the weakest link and he should shoot him. Schroven asked defendant about a scuffle with McLain and defendant responded that he hated him, calling McLain a "motherfucker." When McLain's name came up, defendant asked where he lived. Pinon said next door to Dallas.

Defendant also said he would like to kill Chris Arbour.**[FN3]** He said they should "roll on" Arbour, a slang expression meaning to cause harm. Defendant said it was "kill or be killed time." When Domingo asked why he would want to spend 25 years to life in prison, defendant responded he would rather be in jail than live out here and be a bitch. Several times defendant referred to being a Norteno and said he had gang affiliation and star tattoos that you get only for killing someone.

**FN3**. Arbour was the victim of defendant's 2004 assault conviction, in which defendant used a knife.

**Statements by Defendant's Friends**

Jeffrey Wingard was David Jessop's friend and he also knew defendant. Three months before the killing, defendant told Wingard he was mad at McLain. Wingard told detectives defendant said he was going

to kill McLain, but he thought defendant was joking. He told a defense investigator that he told the police defendant was kidding "to sugar coat it."

Jana Kosta rented a room from defendant's parents. She was sick the night of March 15 and 16. Defendant asked her to tell the police she drove him and Pinon to Mokelumne Hill. Actually, she let defendant use her Jeep that night. He returned crying and hysterical. The next morning his cell phone rang and defendant was upset by the calls. Kosta had seen defendant with a gun.

**Defendant is Arrested and His Residence Searched**

Defendant was arrested on March 17, 2005, for a violation of probation. Police searched his residence and found an empty handgun pouch and .22-caliber ammunition. They swabbed his hands to test for gunshot residue.**[FN4]** Defendant explained he had fired an SKS rifle with Kyle Loock on March 15. Loock denied it.

**FN4**. The People conceded the gunshot residue test results were not admissible.

No evidence relating to defendant was found in David Jessop's room, in McLain's room, or anywhere in that house. There were no fingerprints on the cartridge and no fingerprints belonging to defendant or Pinon were found.

**Defendant's Statements**

Defendant spoke repeatedly to the police about that night; over time his story changed, increasingly implicating him. The morning after the shooting, before he was arrested, defendant made five calls in 20 minutes to a police officer he knew, Chris Villegas. When Villegas returned the last call, defendant told him he was concerned about rumors he had shot someone. Defendant told Villegas he was home all night. That afternoon, defendant called Villegas again. Schroven had called defendant and told him the police were looking for him and Pinon and the police were on their way to defendant's home. Defendant told Villegas he had not seen Pinon for a month. Villegas advised defendant to tell the truth.

Later that day, defendant went to the police for an interview. In defendant's first interview, he said he went to Schroven's about 11:00 p.m. for an hour. Kosta took him and waited in the car; they picked up Pinon who was going to Rhonda's. Defendant did not have a gun that night. If there was gunshot residue on his hands it was probably due to his firing an SKS rifle the day before. Defendant said he had been told that Vince Tiffany did the shooting.

Later, defendant told the police a third person told him Pinon did the killing and Pinon told defendant, "I did not mean to do it." Defendant admitted he was a Norteno and had ties with East Side Stockton. In a second interview, defendant told the police that Pinon had called him crying, saying he did not mean to do it. Defendant claimed the five people who said he had a gun that night were lying and that he called Pinon a bitch all the time. Defendant was adamant he did not shoot anyone. "I'm tellin' ya I didn't fuckin' shoot this motherfucker and I want to fuckin'--you know it's bullshit that my name's been gettin' thrown around in some shit

4

like this."

On March 18, after defendant and Pinon were arrested, defendant sent a note that he needed to talk to Detective Jon Thompson right away. Defendant wanted to know "what's the deal" with arresting Pinon. The police told defendant he was lying. When the police told defendant he had the gun, defendant responded he took the gun out of Pinon's hand, but Pinon took it back. Defendant said they went to McLain's because Pinon wanted some weed. He claimed Pinon had money and there was no plan to rob McLain. Defendant said he went to McLain's to "squash a beef" with BJ Moreno. When the police suggested defendant already had his stripes for stabbing Arbour, defendant replied, "I don't give a fuck about gangs, man." The police said the evidence would tell the story and the leather in the Jeep was absorbent. Defendant guessed it might have gunpowder on it and explained he was standing right behind Pinon when Pinon shot. Defendant then ended the interview.

Defendant asked to talk to the police again. Defendant wanted to cooperate and make a deal. He said he went to Schroven's that night and Pinon pulled out a gun, cocking bullets. Supposedly one fell on the floor. Defendant and Pinon got in an argument; Pinon was drunk, but defendant was sober. Pinon wanted some weed and asked defendant to take him to McLain's. At McLain's defendant waited in the car; he wanted McLain to come out to "squash a beef." Pinon came out of the house and told defendant to come. There was no one inside. Pinon went upstairs and defendant heard pounding. Pinon kicked a door down. Defendant grabbed the gun, but Pinon pushed him against the wall and took the gun back. Pinon said, "we're coming up."

Defendant started to leave when he heard another door kicked in. He went upstairs and saw Pinon with a gun and a guy's feet sticking out of the bed. Defendant put his hand to Pinon's shoulder. As he grabbed Pinon's shoulder, there was a pop. Then he saw blood coming out of the guy's mouth. Pinon put the gun to defendant's stomach and told him to get to the Jeep. Defendant dropped Pinon at Rhonda's.

Defendant told the police he would testify against Pinon. He claimed he did not know Pinon intended to "jack" or rob McLain. The phrase "coming up" can mean to steal someone's money. Defendant conceded his earlier statements were lies. He explained the interviews with others may not match his story because a lot of people did not like him.

Defendant told a similar story about the shooting when Loock visited him in jail. The conversation was taped and played at trial. Defendant told essentially the same story when he testified at trial.

**Gang Evidence**

Villegas believed defendant was a Norteno gang member and associated with East Side Stockton. Defendant's stabbing of Arbour was gang related.

Captain Jim Macedo testified for the prosecution as a gang expert. He testified defendant was a validated and documented Norteno gang member. The prosecutor asked about the following hypothetical: Two

Valley Springs Nortenos, one with a gun, enter a house where a young man is in bed. The roommate's door is forced open and one looks for things to steal while the other holds the gun. Macedo testified that scenario would benefit the Norteno gang; it would elevate the participants' status and intimidate witnesses. Macedo said the same hypothetical, where one Valley Spring Norteno shoots the man in bed and both flee without taking anything, also benefitted the gang by causing fear and intimidation.

Over a relevancy objection, Macedo testified to the reasons one gang member with a gun would bring another gang member to commit a robbery. He would want someone to watch his back, to collect the items, or to serve as a lookout. The gang member would not want to do something alone; he would want to show "you were down for one another." Gangs were all about intimidation and fear; alone one might not be intimidating, but in a group it "look[s] larger." Further, the gang member would want a witness to vouch for him; to prove he did not keep money for himself and to show the crime was committed for the gang. The reward was not the crime itself, but the notoriety that comes afterwards.

Macedo testified that calling another a bitch, a scrap or the weakest link is taunting, testing the other person. It also serves to pep them up just before a crime, to psychologically prepare the partner. Mokelumne Hill was Norteno turf, but on the fringe.

Macedo had listened to a tape of defendant's phone call in jail where he talked about the Nuestra Familia and the troubles it was encountering. Defendant also discussed a Norteno street gang in San Jose and a member whose uncle or father was a shot caller in Pelican Bay State Penitentiary. In another conversation defendant was collecting information about rival gang activity. These calls showed defendant still had control in the neighborhood.

The defense called James Hernandez, a professor of criminal justice at California State University at Sacramento. He testified Nortenos are an identity group, not a criminal street gang. He found no sign defendant was involved in an actual street gang or that the shooting was for the benefit of the gang. Hernandez claimed all Nortenos are street gang members, but they are not all criminal street gang members. Defendant testified everyone knew he was a Norteno, but it was an identity not a gang thing. He had a "Norte" tattoo on his back with two stars.

**The Bribery**

Shortly after defendant went to jail he offered a correctional officer $5,000 if the officer would help get him out of jail. The officer told his supervisor about the offer and then wore a wire. In subsequent negotiations, defendant offered $2,000 and a 1979 Camaro worth $13,000.

People v. Rocha, 2009 Cal. App. Unpub. LEXIS 7079, 1-12 (Cal. App. 3d Dist., 2009).

6

1  **II.**   **DISCUSSION**

2      **A.**   **Jurisdiction**

3      Relief by way of a petition for writ of habeas corpus extends to a person in

4  custody pursuant to the judgment of a state court if the custody is in violation of the

5  Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. §

6  2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he

7  suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the

8  conviction challenged arises out of the Calaveras County Superior Court, which is

9  located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly,

10  the Court has jurisdiction over the action.

11      **B.**   **Legal Standard of Review**

12      On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

13  Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

14  filed after its enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 326 (1997); <u>Jeffries v. Wood</u>,

15  114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of

16  the AEDPA; thus, it is governed by its provisions.

17      Under AEDPA, an application for a writ of habeas corpus by a person in custody

18  under a judgment of a state court may be granted only for violations of the Constitution

19  or laws of the United States. 28 U.S.C. § 2254(a); <u>Williams v. Taylor</u>, 529 U.S. at 375 n.

20  7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in

21  state court proceedings if the state court's adjudication of the claim:

22      (1) resulted in a decision that was contrary to, or involved an
    unreasonable application of, clearly established federal law, as
23      determined by the Supreme Court of the United States; or

24      (2) resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence presented in the State
25      court proceeding.

26  28 U.S.C. § 2254(d).

27      1.   Contrary to or an Unreasonable Application of Federal Law

28      A state court decision is "contrary to" federal law if it "applies a rule that

7

contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06. "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009). For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003). A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76, quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the Court further stresses that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing Williams, 529 U.S. at 410) (emphasis in original). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009), quoted by Richter, 131 S. Ct. at 786.

### 2. Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim,

later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006).   Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  Id. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

Richter instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents."  Id.  To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 787.  It follows from this consideration that § 2254(d) "complements the exhaustion

requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

### 3.    Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002).  Musalin v. Lamarque, 555 F.3d at 834.

### III.    REVIEW OF PETITION

#### A.    Claim One: Derivative Liability Instructions

Petitioner contends that the derivative liability instructions were deficient and impermissibly allowed his conviction without the appropriate factual findings. (Pet. at 6.)

### 1.    State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Third Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in a subsequent petition for review by the California Supreme Court. (See Answer, Ex. A.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991)

(establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the California Court of Appeal explained:

**The Jury was Adequately Instructed on Aiding and Abetting as it Relates to Felony Murder**

Defendant contends the instructions on derivative liability as an aider and abettor were "imprecise and incomplete." Specifically, he contends the jury was not given an instruction on aiding and abetting that was tailored for burglary or attempted robbery, the felonies on which the felony-murder theory was predicated. Defendant contends the jury was never instructed that defendant must have aided Pinon at a time when defendant had the specific intent that Pinon accomplish his felonious goal. Defendant contends this instructional error was prejudicial because the jury may have convicted him based solely on his admission that he drove Pinon away after the killing. We reject defendant's contentions.

The People sought a first degree murder conviction on two theories: felony murder based on burglary or attempted robbery and deliberate, premeditated murder. The prosecutor told the jury defendant was guilty if he was the one who shot Jessop or if he was an aider and abettor, a helper. Defendant was guilty if Pinon was the shooter and they went to McLain's to kill or to rob.

**The Jury Instructions**

The court first instructed the jury on felony murder if defendant committed the act that caused Jessop's death. The court then instructed on felony murder if Pinon fired the shot. The court instructed as follows: "To prove the defendant guilty of first degree murder under this theory-- this is a co-participant committed the act--the People must prove that, one, the defendant committed or attempted to commit or aided and abetted burglary or robbery; two, the defendant intended to commit or intended to aid and abet the perpetrator in committing burglary, robbery, or attempted robbery; three, if the defendant did not personally commit or attempt to commit burglary or robbery, then a perpetrator whom the defendant was aiding and abetting personally committed or attempted to commit burglary or robbery; and four, while attempt--committing or attempting to commit burglary or robbery, the perpetrator did an act that caused the death of David Jessop; and five, there was a logical connection between the act causing the death and the burglary or robbery or attempted robbery."

The court further instructed on the necessary connection between the fatal act and the underlying felony. It referred the jury to other

instructions to determine if defendant and Pinon committed or attempted to commit burglary or robbery and to determine if defendant aided and abetted Pinon. Further, the court instructed the jury: "The defendant must have intended to commit or aided and abetted the felonies of burglary or attempted robbery before or at the time of the act causing the death. It is not required that the person, as I said, be the intended victim of a felony. It is not required the defendant be present when the acts causing the death occurred."

Later in instructing the jury on aiding and abetting, the court spoke only in the context of murder. The court instructed the jury: "To prove that the defendant is guilty of the crime charged, murder, based on aiding and abetting that crime, the People must prove that, one, the perpetrator committed the crime; two, the defendant knew that the perpetrator intended to commit the crime; three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and three--and four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he or she knows the perpetrator's unlawful purpose and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of the crime. In all of these--if all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor."

**Analysis**

The law on aiding and abetting is clear; the intent to aid and abet must be formed before or during the crime. "A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime. [Citation.]" (People v. Cooper (1991) 53 Cal.3d 1158, 1164.) "It is settled that if a defendant's liability for an offense is predicated upon the theory that he or she aided and abetted the perpetrator, the defendant's intent to encourage or facilitate the actions of the perpetrator 'must be formed prior to or during "commission" of that offense.'" (People v. Montoya (1994) 7 Cal.4th 1027, 1039.)

Defendant contends that contrary to this rule, the jury could have convicted him simply because he drove Pinon away after the shooting, even though he had no intent to rob McLain. We disagree that the jury could have found defendant guilty based only on driving the Jeep away under the instructions given. The jury was told that to be guilty of felony murder as an aider and abettor, "defendant must have intended to commit or aided and abetted the felonies of burglary or attempted robbery before or at the time of the act causing the death." Thus, if the jury found defendant was an aider and abettor to felony murder, the jury must have found defendant intended to burglarize McLain's room or rob McLain himself, or help Pinon do so, at the time or before Pinon fired the fatal shot. Defendant's boasting and taunting at Schroven's house that night, before going to McLain's home, provided sufficient evidence for the jury to

1   make this finding.

2   People v. Rocha, 2009 Cal. App. Unpub. LEXIS 7079 at 12-17.

3               2.      Legal Standard

4       Jury instructions are generally matters of state law for which federal habeas relief

5   is not available, except insofar as an instructional error implicates the fundamental

6   fairness of a trial in violation of due process or infringes upon an enumerated federal

7   constitutional right. See Waddington v. Sarausad, 555 U.S. 179 (2009); Estelle v.

8   McGuire, 502 U.S. 62, 71-72 (1991). For example, jury instructions may be challenged

9   as constitutionally infirm if they had the effect of relieving the State of its burden of

10  persuasion, beyond a reasonable doubt, on every essential element of a crime. Francis

11  v. Franklin, 471 U.S. 307, 313 (1985) (citing Sandstrom v. Montana, 442 U.S. 510, 520-

12  524 (1979)). A jury instruction that fails to "give effect" to this requirement violates due

13  process. Middleton v. McNeil, 541 U.S. 433, 437  (2004).

14      Even if an error occurred in instructing the jury, however, habeas relief will be

15  granted only if the petitioner can establish that the error had a substantial and injurious

16  effect or influence in determining the jury's verdict. Hedgpeth v. Pulido, 555 U.S. 57, 129

17  S. Ct. 530, 532, 172 L. Ed. 2d 388 (2008) (holding that instructional errors that do not

18  "categorically 'vitiat[e] all the jury's findings" are subject to harmless error analysis

19  (alteration in original)); Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

20              3.      Analysis

21      The prosecutor's theory was that Petitioner was liable for murder as an aider and

22  abettor. Under California law, an aider and abettor shares the guilt of the perpetrator

23  (i.e., principal) if he or she, acting with (1) knowledge of the unlawful purpose of the

24  perpetrator and (2) the intent or purpose of committing, encouraging, or facilitating the

25  commission of the offense, (3) by act or advice aids, promotes, encourages, or instigates

26  the commission of the crime. People v. Delgado, 56 Cal. 4th 480, 486 (2013); People v.

27  Prettyman, 14 Cal. 4th 248, 259 (1996). Moreover, under the natural and probable

28  consequences doctrine, an aider and abettor is guilty not only of the offense she

1  intended to facilitate or encourage but also of any reasonably foreseeable offense
2  committed by the person he aids and abets. Prettyman, 14 Cal. 4th at 261.

3  Petitioner does not contend that the instruction given by the trial court was
4  incorrect. Rather, Petitioner argues that the instruction given did not require the jury to
5  find that Petitioner aided his co-defendant at a time that Petitioner had the requisite
6  specific intent to assist co-defendant in committing the offense.  (Traverse at 7.)

7  As the California Court of Appeal correctly observed, Petitioner's argument is
8  rebutted by the language of the instruction itself, which expressly instructed the jury that
9  "defendant must have intended to commit or aided and abetted the felonies of burglary
10  or attempted robbery before or at the time of the act causing the death." People v.
11  Rocha, 2009 Cal. App. Unpub. LEXIS 7079 at 12-17. A jury is presumed to follow its
12  instructions. See Weeks v. Angelone, 528 U.S. 225, 234 (2000); Richardson v. Marsh,
13  481 U.S. 200, 206, 211 (1987).

14  Further, despite Petitioner's contention that he only drove Pinion away after the
15  shooting, the state court found Petitioner's intent to aid or abet in the crime based on
16  Petitioner's boasting and taunting at a party before the shooting. Given the strong
17  evidence of Petitioner's involvement in the offense and statements made prior to the
18  crime, there is no reasonable likelihood the jury was so confused by the instruction to
19  find Petitioner as an aider and abettor without the intent to burglarize or rob the victims,
20  especially given that the same jury instruction expressly stated that presence alone was
21  insufficient to support guilt as an aider and abettor. See Boyde, 494 U.S. at 380. The
22  California Court of Appeal reasonably determined that there was no due process
23  violation.

24  Finally, even assuming that there was constitutional error, any error was
25  harmless. (Lodged Doc. 4 at 7-8.) Regardless of the harmlessness standard applied by
26  the state court, federal habeas courts always apply the harmless error standard of
27  Brecht v. Abrahamson, 507 U.S. 619, (1993); Fry v. Pliler, 551 U.S. 112, 121-22 (2007).
28  A constitutional error is harmless if it did not have a "substantial and injurious effect or

1    influence" on the jury's verdict. <u>Brecht</u>, 507 U.S. at 637.

2        Despite Petitioner's assertions otherwise, there was more evidence of his

3    involvement in the crime than just driving his co-defendant away from the scene. As the

4    Court of Appeals described, Petitioner made incriminating comments before the crime.

5    There is no reasonable likelihood that the jury would have returned a more favorable

6    verdict if the trial court had more clearly stated required intent and the time at which

7    Petitioner was required to have the required intent. <u>Brecht</u>, 507 U.S. at 637. It is

8    therefore recommended that Petitioner's first claim be denied.

9        **B.    Claim Two: Instructional Error Accomplice Liability Regarding Murder**

10       In his second claim, Petitioner asserts that instructions were prejudicially

11   erroneous in failing to distinguish between aiding and abetting murder and being an

12   accessory after the fact. (Pet. at 6.)

13           1.    State Decision

14       In the last reasoned decision denying Petitioner's claim, the appellate court

15   explained:

16       **The Jury was Adequately Instructed on Aiding and Abetting as it
         Relates to Deliberate, Premeditated Murder**

17

18           Defendant contends the jury was not instructed on the difference
         between being an aider and abettor to murder and being only an
         accessory after the fact. Again, he posits that the jury may have convicted
19       him simply because he admitted he drove Pinon away after the shooting.

20           As set forth above, in instructing the jury on aiding and abetting as
         it relates to murder, the court instructed the jury that it must find that "the
21       defendant knew that the perpetrator intended to commit the crime;" and
         "before or during the commission of the crime, the defendant intended to
22       aid and abet the perpetrator in committing the crime."

23           The key timing issue in aiding and abetting is when defendant's
         intent to aid and abet is formed. "[A]n intent to help the perpetrator get
24       away, formed before cessation of the acts constituting the felony,
         constitutes aiding and abetting. [Citation.]" (<u>In re Malcolm M.</u> (2007) 147
25       Cal.App.4th 157, 171; <u>see</u> <u>People v. Gomez</u> (2008) 43 Cal.4th 249, 256
         [to convict getaway driver of aiding and abetting, his intent to facilitate or
26       encourage the crime must be formed before or during the crime].) The jury
         was properly instructed on this point of law. There was no instructional
27       error.

28   <u>People v. Rocha</u>, 2009 Cal. App. Unpub. LEXIS 7079 at 17-18.

1          2.    Analysis

2          As described above, a challenged jury instruction is not a basis for federal habeas

3   relief except insofar as an instructional error implicates the fundamental fairness of a trial

4   in violation of due process or infringes upon an enumerated federal constitutional right.

5   See Estelle v. McGuire, 502 U.S. at 71-72. Where the challenge is to a refusal or failure

6   to give an instruction, the petitioner's burden is "especially heavy," because "[a]n

7   omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement

8   of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977). See also Villafuerte v.

9   Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

10          Because a failure to give a jury instruction is a trial error, petitioner is entitled to

11   relief only if he can show prejudice. Babb v. Lozowsky, 2013 U.S. App. LEXIS 11463,

12   2013 WL 2436532 (9th Cir. June 6, 2013). Prejudice is shown for purposes of habeas

13   relief if the trial error had a "substantial and injurious effect or influence in determining

14   the jury's verdict." Brecht, 507 U.S. 619, 637 (1993).

15          As set forth above, the California Court of Appeal found that the trial court

16   properly instructed the jury regarding aiding and abetting liability, and the elements

17   required to find petitioner guilty based on such a theory. While the court did not instruct

18   the jury regarding being an accessory after the fact, the court found that the jury was

19   properly instructed on aider and abettor liability, and would not have convicted Petitioner

20   unless it found Petitioner formed the intent to aid and abet the crime before or during the

21   commission of the crime, as instructed. Accordingly, the verdict would not have been

22   different even if Petitioner's requested jury instruction had been given. That reasoning is

23   not "so lacking in justification that there was an error well understood and comprehended

24   in existing law beyond any possibility for fairminded disagreement." Harrington v.

25   Richter, 131 S. Ct. 770, 178 L. Ed. 2d 624, 627 (2011). Fair minded jurist could disagree

26   whether Petitioner's jury would have found Petitioner guilty as an accessory after the

27   fact, rather than an accomplice, if so instructed. Accordingly, habeas relief is not

28   appropriate on this claim. For the reasons explained by the California Court of Appeal,

Petitioner has failed to demonstrate that the trial court's failure to give this instruction was erroneous or prejudicial. The Supreme Court has stated that "it is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Henderson, 431 U.S. at 154. Petitioner has failed to meet his heavy burden, and the Court recommends that the claim be denied.

### C.   Claim Three: Improper Expert Witness Testimony

In his third claim, Petitioner asserts that the trial court erred in admitting expert testimony regarding intent and knowledge. Furthermore, he contends that trial counsel was ineffective for failing to object to the testimony. (Pet. at 6.)

### 1.   State Decision

In the last reasoned decision denying Petitioner's claim, the appellate court explained:

**The People's Gang Expert did not Improperly Opine on Defendant's Intent and Knowledge**

Defendant contends trial counsel tried to prevent Captain Macedo from testifying about an alleged gang member's motive, knowledge and intent. He contends the trial court erred in permitting such testimony. Alternatively, he contends if counsel's objection was insufficient, then counsel was ineffective.

In posing hypotheticals to Macedo based on the facts of this case, the prosecutor asked, "If you're a Norteno gang member and you want to commit a robbery, and you only have one gun, why would you bring another Norteno gang member with [you]?" Defense counsel objected: "Objection. Relevance. Unless it's based on the prior example." The court overruled the objection and permitted Macedo to answer.

Macedo responded there were several reasons to have a fellow gang member present: to watch your back; to collect items for the robbery; to serve as a lookout; to show gang solidarity; to be more imposing and intimidating as a group; and to have someone vouch that the crime was committed for the benefit of the gang.

Defendant contends this testimony was improper gang expert testimony under People v. Killebrew (2002) 103 Cal.App.4th 644. In Killebrew, defendant was convicted of conspiracy to possess a handgun, although he did not have possession of a gun. (Id. at p. 647.) The sole evidence to establish the crime was the testimony of a police officer William Darbee "that when one gang member in a car possesses a gun, every other gang member in the car knows of the gun and will constructively possess the gun." (Id. at p. 652, fn. omitted.)

The <u>Killebrew</u> court surveyed the law on the permissible scope of expert opinion on gangs. Under <u>People v. Gardeley</u> (1996) 14 Cal.4th 605, at page 617, an expert may give an opinion where the subject matter is "'sufficiently beyond common experience'" and the subject matter of the culture and habits of gangs met this criteria. While expert testimony about gang culture and habits was admissible, Darbee's testimony was not of this type. (<u>People v. Killebrew</u>, supra, 103 cal.App.4th at p. 654.) None of the reported cases permitted testimony that a specific individual had specific knowledge or possessed a specific intent. (<u>Id.</u> at p. 658.) The court found Darbee's testimony "did nothing more than inform the jury how Darbee believed the case should be decided. It was an improper opinion on the ultimate issue and should have been excluded. [Citation.]" (<u>Ibid.</u>)

In explaining why expert testimony was not necessary on this topic, the <u>Killebrew</u> court set forth several examples of testimony that would be admissible. "Testimony that a gang would expect retaliation as a result of a shooting such as occurred at Casa Loma Park, that gangs would travel in large groups if expecting trouble, that in a confrontation more than one gang member may share a gun in some identified circumstances, and that oftentimes gang members traveling together may know if one of their group is armed, would have been admissible." (<u>People v. Killebrew</u>, supra, 103 Cal.App.4th at p. 658.)

Defendant contends Macedo's testimony told the jury that defendant and Pinon shared a felonious intent that night. We disagree. Rather, we find Macedo's testimony about the reasons a gang member would commit a crime with another gang member similar to the type of testimony that <u>Killebrew</u> found permissible. It was not testimony about a specific individual's knowledge and intent; instead, it was testimony about what gangs might do in certain situations. Macedo's explanation of the myriad reasons gang members act in groups--particularly the need to intimidate, show gang solidarity and have a vouching witness--is evidence of the culture and habits of gangs and a proper subject of expert testimony under <u>People v. Gardeley</u>, supra, 14 Cal.4th at page 617. There was no error in admitting Macedo's expert opinion and accordingly no ineffective assistance of counsel in failing to raise a proper objection.

<u>People v. Rocha</u>, 2009 Cal. App. Unpub. LEXIS 7079, 18-21.

### 2.    <u>Legal Standard</u>

Evidence erroneously admitted warrants habeas relief only when it results in the denial of a fundamentally fair trial in violation of the right to due process. <u>See</u> <u>Briceno v. Scribner</u>, 555 F.3d 1069, 1077 (9th Cir. 2009) citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." <u>See</u> <u>Estelle</u> at 67-68. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. <u>Id.</u> The court's habeas powers do not allow for the vacatur of a conviction "based on a belief that the trial judge incorrectly

1    interpreted the California Evidence Code in ruling" on the admissibility of evidence. Id. at
2    72.

3       California Evidence Code section 801(b) allows an expert witness to give opinion
4    testimony if the opinion is "[b]ased on matter ... perceived by or personally known to the
5    witness or made known to him at or before the hearing, whether or not admissible, that is
6    of a type that reasonably may be relied upon by an expert in forming an opinion upon the
7    subject to which his testimony relates." California Evidence Code § 801.

8       There is no clearly established law supporting the "proposition that the
9    Constitution is violated by the admission of expert testimony concerning an ultimate
10   issue to be resolved by the trier of fact." See Briceno, 555 F.3d at 1078. "Although a
11   witness is not permitted to give a direct opinion about the defendant's guilt or innocence
12   .... an expert may otherwise testify regarding even an ultimate issue to be resolved by
13   the trier of fact." See Moses v. Payne, 555 F.3d 742, 761 (9th Cir. 2009) (citation
14   omitted, internal quotations omitted).

15          3.   Discussion

16      Petitioner claims that he was denied a fair trial because the gang expert's opinion
17   was prejudicial. Although phrased as hypotheticals, the jury accepted the expert's
18   opinion as direct testimony of Petitioner's motive, knowledge and intent to commit the
19   crime. The question presented on federal habeas review is whether the admission of the
20   gang expert's testimony violated Petitioner's federal constitutional rights. In light of the
21   fact that the expert relied on information that was permissible under California law, and
22   of a type that would reasonably be relied upon by experts in the field, this question can
23   be answered in the negative. See Estelle, 502 U.S. at 67-68. Petitioner has not provided
24   and persuasive authority that the admission of the testimony violated his federal rights.
25   While he argues that the testimony rendered his trial fundamentally unfair, the state court
26   found that the statements did not render an ultimate conclusion regarding Petitioner's
27   intent, but instead was evidence of the culture and habit of gangs, and properly
28   admitted. This Court finds the state court's decision reasonable, and that fair-minded

1  jurists would debate whether the expert witness testimony would be treated as direct

2  evidence of Petitioner's intent to commit the crime and resulted in a fundamentally unfair

3  trial. The state court decision did not result in a decision that was contrary to, or an

4  unreasonable application of federal law. Accordingly, admission of the expert testimony

5  did not violate Petitioner's right to a fair trial. Petitioner is not entitled to habeas corpus

6  relief.

7          4.     Related Ineffective Assistance of Counsel Claim

8        Petitioner additionally claims that his trial counsel rendered ineffective assistance

9  when he failed to object to the testimony provided by the gang expert. (See Pet. at 6.)

10                a.    Governing law

11        In Strickland v. Washington, 466 U.S. 668, 694 (1984), the Supreme Court held

12  that there are two components to an ineffective assistance of counsel claim: "deficient

13  performance" and "prejudice." "Deficient performance" in this context means

14  unreasonable representation falling below professional norms prevailing at the time of

15  trial. See Strickland, 466 U.S. at 688-89. To show "deficient performance," Petitioner

16  must overcome a "strong presumption" that his lawyer "rendered adequate assistance

17  and made all significant decisions in the exercise of reasonable professional judgment."

18  Id. at 690.

19        To meet his burden of showing the distinctive kind of "prejudice" required by

20  Strickland, Petitioner must affirmatively "show that there is a reasonable probability that,

21  but for counsel's unprofessional errors, the result of the proceeding would have been

22  different. A reasonable probability is a probability sufficient to undermine confidence in

23  the outcome." See Strickland, 466 U.S. at 694; see also Richter, 131 S. Ct. at 791 ("In

24  assessing prejudice under Strickland, the question is not whether a court can be certain

25  counsel's performance had no effect on the outcome or whether it is possible a

26  reasonable doubt might have been established if counsel acted differently."); Lockhart v.

27  Fretwell, 506 U.S. 364, 372 (1993) (noting that the "prejudice" component "focuses on

28  the question whether counsel's deficient performance renders the result of the trial

1  unreliable or the proceeding fundamentally unfair").

2      Moreover, it is unnecessary to address both Strickland requirements if petitioner

3  makes an insufficient showing on one. See Strickland, 466 U.S. at 697 ("If it is easier to

4  dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that

5  course should be followed."); Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure

6  to satisfy either prong of the Strickland test obviates the need to consider the other.").

7      In Richter, the Supreme Court reiterated that the AEDPA requires an additional

8  level of deference to a state court decision rejecting an ineffective assistance of counsel

9  claim. "The pivotal question is whether the state court's application of the Strickland

10  standard was unreasonable. This is different from asking whether defense counsel's

11  performance fell below Strickland's standard." See Richter, 131 S. Ct. at 785.

12             b.     Analysis

13      In rejecting this claim when Petitioner raised it on direct appeal, the California

14  Court of Appeal reasoned that petitioner had failed to make either of the requisite

15  Strickland showings. With respect to the deficient performance prong, it noted that the

16  expert witness testimony  was not improperly admitted and therefore there was no basis

17  upon which to object. People v. Rocha, 2009 Cal. App. Unpub. LEXIS 7079, 18-21.

18      The Court of Appeal's determination that the gang expert's testimony was

19  properly admitted under California law is binding on this Court. See Bradshaw, 546 U.S.

20  at 76 (federal habeas court is bound by state court interpretations of state law, even

21  those announced on direct appeal of the challenged conviction). Accordingly, the Court

22  finds that it was not objectively unreasonable for the Court of Appeal to conclude that

23  Petitioner had failed to make the requisite showing of deficient performance with respect

24  to this ineffective assistance claim, since the failure to raise a futile objection does not

25  constitute ineffective assistance of counsel. See, e.g., James v. Borg, 24 F.3d 20, 27

26  (9th Cir. 1994) (failure to take a futile action does not constitute ineffective assistance of

27  counsel), cert. denied, 513 U.S. 935 (1994). Furthermore, as trial counsel's

28  representation did not fall below professional norms, and the testimony was properly

1    admitted, Petitioner was not prejudiced by counsel's conduct. Petitioner is not entitled to

2    relief, and it is recommended that the claim is denied.

3          **D.    Claim Four: Confrontation Clause**

4          In his final claim, Petitioner contends that he was denied his Sixth Amendment

5    right to confront and cross-examine witnesses with regard to hearsay presented by the

6    expert witness. (Pet. at 7.)

7                2.    State Court Decision

8          In the last reasoned decision denying Petitioner's claim, the appellate court

9    explained:

10         **The Gang Expert's Reliance on Hearsay for His Opinions did not**
           **Violate the Confrontation Clause**

11

12              Defendant asserts the gang expert testimony was "replete with
           hearsay." He contends a substantial amount of the testimony about his

13         and other individual's gang status was testimonial hearsay admitted in
           violation of Crawford v. Washington (2004) 541 U.S. 36 [158 L.Ed.2d 177].

14         He contends he was denied his right of confrontation under the Sixth
           Amendment.

15              Defendant recognizes that several California decisions have
           rejected this argument. (People v. Ramirez (2007) 153 Cal.App.4th 1422,

16         1427; People v. Fulcher (2006) 136 Cal.App.4th 41, 56-57; People v.
           Thomas (2005) 130 Cal.App.4th 1202, 1210; see also People v. Geier

17         (2007) 41 Cal.4th 555, 607 [DNA report not testimonial].) Nonetheless, he
           raises the issue to preserve it pending the decision in Melendez-Diaz v.

18         Massachusetts, Docket No. 07-591 (cert. granted March 18, 2008),
           concerning whether a laboratory report is testimonial hearsay, which he

19         believes will address what is testimonial hearsay in the context of expert
           opinion.

20

21              After briefing in this case was complete, the United States Supreme
           Court issued its opinion in Melendez-Diaz v. Massachusetts (2009)    U.S.

22         , [174 L.Ed.2d 413], 129 S.Ct. 2527 [2009 U.S. LEXIS 4734]. The court
           held affidavits reporting the result of forensic analysis that showed the

23         material seized by the police and connected to defendant was cocaine
           were testimonial. Thus, the affiants were witnesses subject to defendant's

24         right to confrontation under the Sixth Amendment. The affidavits fell within
           the "'core class of testimonial statements'" described in Crawford: "'ex

25         parte in-court testimony or its functional equivalent-that is, material such
           as affidavits, custodial examinations, prior testimony that the defendant

26         was unable to cross-examine, or similar pretrial statements that declarants
           would    reasonably    expect    to    be    used    prosecutorially,'    [citation];

27         'extrajudicial statements . . . contained in formalized testimonial materials,
           such as affidavits, depositions, prior testimony, or confessions,' [citation];

28         'statements that were made under circumstances which would lead an
           objective witness reasonably to believe that the statement would be

                                         22

1    available for use at a later trial,' [citation]." (Crawford v. Washington,
     supra, 541 U.S. 36, 51-52 [158 L.Ed.2d 177, 193].)

2        Defendant has failed to show Melendez-Diaz is inapplicable to this
3    case. No affidavits or other formalized testimonial materials are involved.
     Defendant simply asserts there was testimonial hearsay; he does not
4    explain why any of the hearsay relied upon by the gang expert was
     testimonial or even identify the offending evidence. In short, defendant
5    offers no reason for this court to reconsider established California law that
     a gang expert's reliance on hearsay matters in forming his opinion does
6    not violate the Sixth Amendment. (People v. Thomas, supra, 130
     Cal.App.4th at p. 1210.)

7    People v. Rocha, 2009 Cal. App. Unpub. LEXIS 7079 at 21-24.

8              3.    Legal Standard

9        The Sixth Amendment to the United States Constitution grants a criminal

10   defendant the right "to be confronted with the witnesses against him." U.S. Const.

11   amend. VI. "The 'main and essential purpose of confrontation is to secure for the

12   opponent the opportunity of cross-examination.'" Fenenbock v. Director of Corrections

13   for California, 692 F.3d 910 (9th Cir. 2012) (quoting Delaware v. Van Arsdall, 475 U.S.

14   673, 678 (1986)). The Confrontation Clause applies to the states through the Fourteenth

15   Amendment. Pointer v. Texas, 380 U.S. 400, 406 (1965).

16       In 2004, the United States Supreme Court held that the Confrontation Clause bars

17   the state from introducing into evidence out-of-court statements which are "testimonial"

18   in nature unless the witness is unavailable and the defendant had a prior opportunity to

19   cross-examine the witness, regardless of whether such statements are deemed reliable.

20   Crawford v. Washington, 541 U.S. 36 (2004). The Crawford rule applies only to hearsay

21   statements that are "testimonial" and does not bar the admission of non-testimonial

22   hearsay statements. Id. at 42, 51, 68. See also Whorton v. Bockting, 549 U.S. 406, 420

23   (2007) ("the Confrontation Clause has no application to" an "out-of-court nontestimonial

24   statement.").

25       Although the Crawford court declined to provide a comprehensive definition of the

26   term "testimonial," it stated that "[s]tatements taken by police officers in the course of

27   interrogations are . . . testimonial under even a narrow standard." Crawford, 541 U.S. at

28   52. The court also provided the following "formulations" of a "core class" of testimonial

23

1   statements: (1) "ex parte in-court testimony or its functional equivalent - that is, material

2   such as affidavits, custodial examinations, prior testimony that the defendant was unable

3   to cross-examine, or similar pretrial statements that declarants would reasonably expect

4   to be used prosecutorially;" (2) "extrajudicial statements . . . contained in formalized

5   testimonial materials, such as affidavits, depositions, prior testimony, or confessions;"

6   and (3) "statements that were made under circumstances which would lead an objective

7   witness reasonably to believe that the statement would be available for use at a later

8   trial." <u>Id.</u> at 51-52. The court in <u>Crawford</u> also pointed out that the Sixth Amendment

9   Confrontation Clause "does not bar the use of testimonial statements for purposes other

10  than establishing the truth of the matter asserted." <u>Id.</u> at 59, n.9. However, "state

11  evidence rules do not trump a defendant's constitutional right to confrontation," and a

12  reviewing court "ensures that an out-of-court statement was introduced for a 'legitimate,

13  nonhearsay purpose' before relying on the not-for-its-truth rationale to dismiss the

14  Confrontation Clause's application." (citation omitted). <u>Williams v. Illinois</u>, 132 S.Ct.

15  2221, 2226, 183 L. Ed. 2d 89 (2012).

16       In rejecting petitioner's Confrontation Clause arguments, the California Court of

17  Appeal specifically based its reasoning on the decisions in <u>People v. Thomas</u>, 130 Cal.

18  App.4th 1202, 30 Cal. Rptr. 3d 582 (2005), <u>People v. Fulcher</u>, 136, Cal.App.4th

19  41(2006), and <u>People v. Ramirez</u>, 153 Cal. App. 4th 1422, 64 Cal. Rptr. 3d 96 (2007). In

20  <u>Thomas</u>, the California Court of Appeal explained that:

21       <u>Crawford</u> does not undermine the established rule that experts can testify
         to their opinions on relevant matters, and relate the information and
22       sources upon which they rely in forming those opinions. This is so
         because an expert is subject to cross-examination about his or her
23       opinions and additionally, the materials on which the expert bases his or
         her opinion are not elicited for the truth of their contents; they are
24       examined to assess the weight of the expert's opinion. <u>Crawford</u> itself
         states that the Confrontation Clause "does not bar the use of testimonial
25       statements for purposes other than establishing the truth of the matter
         asserted." (<u>Crawford</u>, supra 541 U.S. at p. 59, fn. 9, 124 S. Ct. at p. 1369,
26       fn. 9, citing <u>Tennessee v. Street</u> (1985) 471 U.S. 409, 414, 105 S. Ct.
         2078, 85 L.Ed.2d 425.)

27  
28  <u>Thomas</u>, 130 Cal. App.4th at 1210. Similarly, in <u>Ramirez</u>, the California Court of Appeal

1    concluded that "hearsay in support of expert opinion is simply not the sort of testimonial

2    hearsay the use of which <u>Crawford</u> condemned." 153 Cal. App.4th at 1427.

3         Recently, the United States Supreme Court reiterated that the Confrontation

4    Clause "has no application to out-of-court statements that are not offered to prove the

5    truth of the matter asserted." <u>Williams v. Illinois</u>, 132 S. Ct. 2221, 2228, 183 L. Ed. 2d 89

6    (2012). Thus, "[u]nder settled evidence law, an expert may express an opinion that is

7    based on facts that the expert assumes, but does not know, to be true." <u>Id.</u> The Court

8    noted that an out-of-court statement is testimonial if it has "the primary purpose of

9    accusing a targeted individual of engaging in criminal conduct" and, usually, it involves a

10   "formalized statement[ ] such as affidavits, depositions, prior testimony, or confessions."

11   <u>Id.</u> at 2242. Numerous federal courts have specifically held since the decision in

12   <u>Crawford</u> that the introduction of otherwise inadmissible evidence in support of a gang

13   expert witness' testimony does not violate the Confrontation Clause. <u>See e.g.</u>, <u>United</u>

14   <u>States v. Palacios</u>, 677 F.3d 234, 243-44 (4th Cir. 2012); <u>United States v. Ayala</u>, 601

15   F.3d 256, 275 (4th Cir. 2010); <u>Alejandre v. Brazelton</u>, No. C 11-4803 CRB (PR), 2013

16   U.S. Dist. LEXIS 57390, 2013 WL 1729775, at **10 -11 (N.D. Cal. April 22, 2013) (expert

17   witness' testimony concerning the meaning of defendant's tattoos based in part on

18   hearsay statements from an undisclosed parolees did not violate Confrontation Clause);

19   <u>Her v. Jacquez</u>, No. 2:09-cv-612 JAM TJB, 2011 U.S. Dist. LEXIS 41767, 2011 WL

20   1466868, at *33 (E.D. Cal. Apr. 18, 2011) (gang expert's testimony about specific gangs

21   and their activities and membership, based on information imparted to him by others, did

22   not violate Confrontation Clause because underlying information not offered for its truth

23   but merely to support expert's opinion); <u>Walker v. Clark</u>, No. CV 08-5587-CJC (JEM),

24   2010 U.S. Dist. LEXIS 39816, 2010 WL 1643580, at *15 n. 8 (C.D. Cal. Feb. 18, 2010)

25   (citing cases); <u>Lopez v. Jacquez</u>, No. 1:09-CV1451 AWI JMD HC, 2010 U.S. Dist. LEXIS

26   66515, 2010 WL 2650695, at *5 (E.D. Cal. July 1, 2010) ("[T]he Court does not find that

27   an objective application of <u>Crawford</u> would result in a finding that the gang expert's

28   reliance on hearsay testimony to explain his opinion that Petitioner was a member of the

25

1   West Fresno Nortenos, and that the West Fresno Nortenos area criminal street gang, to

2   be in violation of Petitioner's Confrontation Clause rights); <u>Cason v. Hedgpeth</u>, No. CV

3   08-4576 -JVS (RNB), 2009 U.S. Dist. LEXIS 130905, 2009 WL 1096209, at *13-14 (C.D.

4   Cal. Apr. 22, 2009) (hearsay evidence regarding the witness's gang membership did not

5   violate <u>Crawford</u> because it was admitted not for the truth of the matter asserted but to

6   support detective's opinion that witness was a gang member); <u>Ortiz v. Tilton</u>, Civ. No.

7   06-1752-L (CAB), 2008 U.S. Dist. LEXIS 110919, 2008 WL 2543440, at *16 (S.D. Cal.

8   May 5, 2008) (gang expert's reliance on field investigation reports, defendants'

9   admissions as to gang member status, and other hearsay as basis for opinion did not

10  violate <u>Crawford</u> because materials were not admitted for truth of the matter asserted

11  and his reliance on them was subject to cross-examination); <u>Nguyen v. Evans</u>, No. C 06-

12  04630 JSW, 2008 U.S. Dist. LEXIS 40747, 2008 WL 1994902, at *5 (N.D. Cal. May 5,

13  2008) (gang expert's testimony regarding information he received from other gang

14  members and victims, which he used as a basis for his opinion, did not violate

15  <u>Crawford</u>); <u>Eddington v. Adams</u>, No. CV F 06-1770 DLB HC, 2008 U.S. Dist. LEXIS

16  54653, 2008 WL 397290, at *10 (E.D. Cal. Feb. 8, 2008) (gang expert's reliance on gang

17  member's statement as part of basis for opinion did not violate <u>Crawford</u>)."); <u>Thomas v.</u>

18  <u>Chromes</u>, No. ED CV 06-00787-JFW (VBK), 2008 U.S. Dist. LEXIS 110387, 2008 WL

19  4597214, at *7 (C.D. Cal. Oct. 10, 2008) (gang expert's reliance on gang members'

20  statements as basis for opinion that petitioner was a gang member did not violate

21  <u>Crawford</u>).

22          4.   <u>Analysis</u>

23          Here, Captain Jim Macedo testified at Petitioner's trial that he personally knew

24  Petitioner, patrolled Petitioner's neighborhood, and was involved in an investigation of

25  Petitioner's parents. (Rpt'rs Tr. at 1424.) Based on Macedo's knowledge, it was his

26  opinion that Petitioner was a Norteno gang member. (<u>Id.</u> at 1424-25.) He also based his

27  opinion on various documents, including gang questionnaire forms, medical

28  questionnaire forms, Petitioner's tattoos, and his and other peace officer's

1   communications with contacts including other gang members and associates. (Id. at

2   1425-31.) Macedo testified that he had seen Petitioner in the company of other gang

3   members approximately 30 times, and in places believed to be gang territory at least 20

4   times. (Rpt'rs Tr. at 1435.)

5        Macedo's testimony about the sources of his information about the Norteno gang

6   culture and evidence that Petitioner was known gang member did not violate Petitioner's

7   rights under the Confrontation Clause because it was not offered for the truth of the

8   information asserted, but as a foundation for Macedo's expert testimony regarding

9   criminal street gangs. A review of the record indicates that whatever documents were

10  presented to Macedo during trial, he did not testify at Petitioner's trial to the truth of the

11  statements in such reports or questionnaires. Rather, any such statements were used by

12  Macedo merely to form the basis for his opinions. In this regard, the jury was specifically

13  instructed that hearsay matters relied on by expert witnesses to form their opinions were

14  not offered for the truth of those matters but were to be considered only in evaluating the

15  basis of the expert's opinions. (Clerk's Tr. at 552; CALCRIM 360.) Further, as an expert,

16  Macedo could properly base his opinion on inadmissible evidence, including hearsay, of

17  a kind that experts in the field regularly consult.[1]

18       Even if the statements relied on by Detective Macedo in forming his opinion

19  testimony could be considered testimonial in nature, their admission did not implicate

20  Petitioner's right to confrontation. As explained by the court in United States v. Johnson,

21  587 F.3d 625, 635 (4th Cir. 2009):

22       An expert witness's reliance on evidence that Crawford would bar if
         offered directly only becomes a problem where the witness is used as little

23       more than a conduit or transmitter for testimonial hearsay, rather than as a
         true expert whose considered opinion sheds light on some specialized

24       factual situation. Allowing a witness simply to parrot "out-of-court
         testimonial statements of cooperating witnesses and confidential

25       informants directly to the jury in the guise of expert opinion" would provide

26

27       _____
         [1] Both California and Federal rules of evidence permit testimony by an expert even where the
         expert's opinion is based on inadmissible hearsay evidence, as long as the evidence is of a kind experts in

28       the field regularly consult. See Cal. Evid. Code § 801; Fed. R. Evid. 703.

1

2

3

4

5

6

7

8

> an end run around <u>Crawford</u>. <u>United States v. Lombardozzi</u>, 491 F.3d 61, 72 (2d Cir. 2007). For this reason, an expert's use of testimonial hearsay is a matter of degree. <u>See</u> Ross Andrew Oliver, Note, <u>Testimonial Hearsay as the Basis for Expert Opinion: The Intersection of the Confrontation Clause and Federal Rule of Evidence 703 After Crawford v. Washington</u>, 55 Hastings L. J. 1539, 1560 (2004) (describing a "continuum of situations" in which experts rely on testimonial hearsay). The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay. As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no <u>Crawford</u> problem. The expert's opinion will be an original product that can be tested through cross-examination.

9

10

11

<u>See also</u> <u>United States v. Law</u>, 528 F.3d 888, 911-12, 381 U.S. App. D.C. 270 (D.C. Cir. 2008) (finding no Confrontation Clause violation based on admission of an expert's testimony because the expert did not simply convey statements by other declarants).

12

13

14

15

16

17

18

19

20

Here, Macedo was not merely presented to enable the prosecution to present testimonial hearsay without objection. Rather, as part of his job to learn about gang culture and activities, he spoke to many persons, including gang members, victims, and other criminal investigators. He offered an opinion of the relationship between gangs and the crimes committed by those gangs based on information he had gathered though those conversations and his own investigation. Petitioner was given the opportunity to cross-examine Macedo regarding his opinions as well as the basis thereof, and the jury was able to judge the credibility of Macedo's testimony in light of the sources he described in his testimony and upon which he relied.

21

22

23

24

25

The state courts' conclusion that Macedo's expert testimony did not violate Petitioner's rights under the Confrontation Clause is not contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the state court record. Accordingly, Petitioner is not entitled to federal habeas relief with respect to this claim.

## IV.   **RECOMMENDATION**

26

27

28

Accordingly, it is hereby recommended that the petition for a writ of habeas corpus be DENIED with prejudice.

This Findings and Recommendation is submitted to the assigned District Judge, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   August 27, 2013                     /s/ Michael J. Seng
                                            UNITED STATES MAGISTRATE JUDGE